[No. F041200. Fifth Dist. July 9, 2003.]

PROTECT OUR WATER et al., Plaintiffs and Appellants, v.
COUNTY OF MERCED, Defendant and Respondent;
CALAVERAS MATERIALS INCORPORATED, Real Party in Interest and
Respondent.

COUNSEL

Rose M. Zoia for Plaintiffs and Appellants.

Dennis Myers, County Counsel, for Defendant and Respondent.

Mason, Robbins, Gnass & Browning and William E. Gnass for Real Party in Interest and Respondent.

OPINION

**WISEMAN, J.—** ■ When practicing appellate law, there are at least three immutable rules: first, take great care to prepare a complete record; second, if it is not in the record, it did not happen; and third, when in doubt, refer back to rules one and two. In this case, the parties totally missed the appellate mark by failing to provide an adequate record for review.

Appellants Protect Our Water, San Joaquin Raptor Rescue Center, and the Merced River Valley Association (collectively POW) filed a petition for writ of mandate. POW challenged the approval by respondent County of Merced (County) of a massive project involving the mining of 15 million tons of

aggregate reserves on 456 acres near the Merced River by respondent Calaveras Materials Incorporated (CMI). The trial court denied POW's writ petition. POW appeals, claiming a number of California Environmental Quality Act (CEQA)[1] violations.

The administrative record is large—14 binder-sized volumes. It reads as if its preparers randomly pulled out documents and threw them into binders, failing to organize them either chronologically or by subject matter. Key findings required under CEQA are impossible to find—let alone sufficient to enable us to determine whether they are supported by substantial evidence.

We publish not because the merits of this case warrant public proclamation but because we have observed a pattern of CEQA cases with poorly prepared records making review difficult, if not impossible. We iterate to anyone who will listen: CEQA has very specific requirements regarding what findings must be in the record. Do not ignore the requirements or, like these parties, you will find yourself in the unenviable position of having your judgment reversed and being forced to start over at great public and personal expense.

Judgment is reversed.

## PROCEDURAL AND FACTUAL HISTORIES

As of 2000, CMI was facing a shortage of aggregate supply for its river rock processing facilities near the town of Hopeton. CMI identified the Woolstenhulme Ranch site as a new source of long-term permitted reserves. The Woolstenhulme Ranch site is located on a 635-acre parcel in the northeastern portion of the County, approximately 12 miles north of the City of Merced, near the town of Hopeton. CMI estimated that the Woolstenhulme Ranch site could provide sufficient aggregate reserves to meet its anticipated ongoing demand for construction materials for over 30 years. The property is utilized for agricultural purposes, including annual hay production and live-stock grazing, and contains grasslands, riparian and oak woodlands, and wetland habitats.

CMI applied for a conditional use permit to mine approximately 15 million tons of Portland cement-grade concrete sand and gravel from 456 acres of the Woolstenhulme Ranch site in 14 phases over a 35-year period (the project).

---

[1] CEQA is codified at Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless otherwise indicated.

The project will create 343 acres of wetlands and ponds and 113 acres of upland and grazing land on the mined property. The aggregate resources are derived from deposits of gravel, sand and overbank silt associated with the Merced River located to the south of the project site. The aggregate deposit is buried below separate layers of topsoil and overburden material. Excavationof the aggregate requires the removal of one to eight and one-half feet of topsoil and overburden layers to expose the aggregate layer. Aggregate is to be mined to an approximate average depth of 20 feet and a maximum depth of 30 feet below the existing ground surface, and mining will extend into the groundwater table in all phases. The aggregate mined from the project will be used in construction materials, including asphalt, concrete and plaster, for homes, buildings, roads, bridges, dams, and related public and private infrastructure.

The aggregate will be excavated using diesel-powered hydraulic excavators or loaders and transported to CMI's existing processing facility by off-road, heavy-duty haul trucks using both temporary and permanent haul-and-access roads on the project site. After the initial phases of mining are completed, depending upon the economic feasibility at the time, excavated material may be transported to the processing plant using an electrically driven overland conveyor system, or by a combination of trucks and conveyors, or solely by trucks.

The County circulated a notice of preparation of a draft environmental impact report (EIR), along with a CEQA initial study. A draft EIR was completed, a public review period commenced, and comments were received. The draft EIR, dated August 2000, concluded that the project would create a significant unavoidable impact on agriculture by converting approximately 421 acres of agricultural land to a gravel mining and reclamation operation. Approximately 17 percent (71 acres) of the 421 acres is considered prime agricultural land. The draft EIR acknowledged that there are no feasible measures that would fully mitigate for the loss of productive prime agricultural soils.

The draft EIR provided the following cumulative impact assessment:

*"LAND USE, AGRICULTURE AND OPEN SPACE* [¶] ... [¶]

"The Proposed Project will convert a small portion of the [County's] productive agricultural land to an alternate open space. The project does not

consist of the conversion of agricultural land to an urban use ....
The permanent loss of productive agricultural land (although relatively
minor) would contribute to the cumulative impact to agricultural land
conversion in [the] County.... [¶] ... [¶]

### *"BIOLOGICAL RESOURCES*

"In addition to other cumulative development the Proposed Project would
contribute incrementally to the cumulative loss or alteration of wetland,
woodland and riparian habitats and special status animal species habitat.
Grassland communities are high value foraging habitat for Swainson's Hawk
which is known to forage grasslands within a ten-mile radius of its nesting
site. The accelerated conversion of annual grassland habitat to vineyards and
orchards throughout the vicinity of the project site is considered a significant
cumulative impact. In addition, it is suggested that already over 95% of
California wetlands have been converted to non-wetland status, so any net
loss of wetlands is considered a significant cumulative impact. Therefore, the
Proposed Project would result in a contribution to significant cumulative
impacts on wetland, woodland and riparian habitats and special status animal
species habitat."

The draft EIR identified and analyzed four project alternatives: the no-
project alternative; the agricultural and habitat-preservation alternative; the
alternate location alternative; and the dredge-tailings alternative. The draft
EIR concluded: "[T]he No Project Alternative avoids or reduces most of the
significant, unavoidable impacts of the Proposed Project except those related
to traffic and air quality and would be considered the environmentally
superior alternative. Other than the No Project Alternative, the Agriculture
and Habitat Preservation Alternative would reduce significant impacts associ-
ated with the conversion of prime agricultural lands to non-agricultural uses
as well as preserve habitat for sensitive species and is considered to be
environmentally superior to the Proposed Project. However, the Agriculture
and Habitat Preservation Alternative does not provide the same amount of
aggregate and the land use conflicts between agricultural operations and
non-agricultural uses could continue to result from this alternative to a lesser
extent than from the Proposed Project."

The County's planning commission staff recommended approval of the
project and certification of the EIR subject to several modifications to avoid
significant impacts. Specifically, the planning commission staff recommended
deletion of phase 11 adjacent to the Hopeton School and deferment of phases
9 and 13, which included prime farmland and involved policy issues to be

addressed through the pending general plan amendment to incorporate the state's mineral land classification report.

On November 15, 2000, the County's planning commission certified the final EIR and approved the project. The planning commission adopted a statement of overriding considerations to permit mining for phases 9, 11 and 13, finding that the benefits of the project outweighed the adverse impacts.

The planning commission decision was appealed to the County's board of supervisors, which held public hearings on January 23 and February 1 and 2, 2001. The board of supervisors adopted a statement of overriding considerations to permit phases 9, 11 and 13, certified the final EIR and approved the project. Later, the County filed a notice of determination, which advised that the project would have a significant effect on the environment due to the loss of 71 acres of prime farmland.

On March 7, 2001, POW filed a petition for writ of mandate, challenging the County's approval of the project and certification of the final EIR. The trial court denied the petition. POW appealed and filed a petition for writ of supersedeas, or other appropriate stay order, seeking an immediate stay of CMI's mining activities related to the project. We denied the petition.

## DISCUSSION

POW argues that the trial court erred in denying its mandamus petition on one or more of the following grounds: 1) the final EIR's range of alternatives was inadequate and the County improperly approved the project despite the existence of feasible alternatives; 2) the final EIR failed to adequately evaluate all environmental impacts of the project, including biological, land use and cumulative impacts; 3) the final EIR failed to adequately respond to comments; and/or 4) the County's findings are not supported by substantial evidence.[2]

---

[2] CMI filed a motion to dismiss the appeal as untimely, arguing the appeal was filed more than 60 days after service of the order denying the writ of mandate. ■ However, the appeal was filed within 60 days after entry of the judgment, and the judgment is appealable. (See *Catalina Investments, Inc. v. Jones* (2002) 98 Cal.App.4th 1, 5, fn. 3 [119 Cal.Rptr.2d 256]; *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 367, fn. 3 [78 Cal.Rptr.2d 44].)

I. *CEQA principles*

We begin by presenting an overview of the CEQA review process and the appropriate standard governing our assessment of POW's contentions.

A. *CEQA review process*

In *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*), the California Supreme Court explained in detail the purposes and framework of the CEQA review process:

"We have repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." [Citation.]' [Citation.] To this end, public participation is an 'essential part of the CEQA process.' [Citations.]

"With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.] ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citations.]

"When an EIR is required, the lead agency initially prepares a draft EIR. Once the draft EIR is completed, a comment period is provided for the public and interested agencies. [Citations.] Public hearings to discuss the draft EIR are encouraged, but not required. [Citation.] The comment period is generally no shorter than 30 days and no longer than 90 days. [Citations.]

"In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. [Citations.] In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects. [Citation.] 'There must be good faith, reasoned analysis in response [to the comments received]. Conclusory statements unsupported by factual information will not suffice.' [Citation.] Thus, it is plain that the final EIR will almost always contain information not included in the draft EIR.

"The final substantive step in the EIR review process is certification of the final EIR. The lead agency is required to certify that the final EIR has been completed in compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. [Citation.] CEQA also requires that, before approving a project, the lead agency 'find either that the project's significant environmental effects identified in the [final] EIR have been avoided or mitigated or that the unmitigated effects areoutweighed by the project's benefits. [Citations.]' [Citation.]" (*Laurel Heights II, supra*, 6 Cal.4th at pp. 1123–1124, fns. omitted.)

### B. *Standard of review*

We explained the standard of review for CEQA issues in *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 25–26 [82 Cal.Rptr.2d 398]:

"In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion. [Citation.] Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence. The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document. [Citations.] An adequate EIR must be 'prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.' [Citation.] It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] The court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. [Citation.]

"CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. [Citation.] The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion. [Citation.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citations.]" (See also *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 192–193 [55 Cal.Rptr.2d 625]; §§ 21005, 21100; CEQA Guidelines, § 15126, subd. (a)

[EIR shall discuss the significant environmental effects of the proposed project].[3])

" 'On appeal, the appellate court's "task ... is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law." [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]' [Citation.]" (*Stanislaus Natural Heritage Project v. County of Stanislaus, supra*, 48 Cal.App.4th at pp. 192–193; see also *Laurel Heights I, supra*, 47 Cal.3d at p. 392.)

With these principles in mind, we turn to POW's contentions.

II. *Adequacy of range of alternatives/existence of feasible alternatives*

POW argues that the project was improperly approved because the final EIR's range of alternatives was inadequate and there existed feasible alternatives with fewer environmental impacts.

■ An EIR must discuss project alternatives even when it concludes the project's significant environmental impacts will be avoided or substantially reduced by mitigation measures. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 17.20, p. 656; see also *Laurel Heights I, supra*, 47 Cal.3d 376, 400–403.) In approving a project, the agency is not required to adopt findings on the proposed project alternatives if it finds the project's significant environmental impacts will be avoided or substantially lessened by mitigation measures. However, if any of the project's significant environmental impacts will not be avoided or substantially lessened by mitigation measures, the agency must, before approving the project, make written findings that the project alternatives are infeasible. (§ 21081, subd. (a)(3); Guidelines, § 15091, subd. (a)(3).) The agency's findings must also describe the specific reasons for rejecting the alternatives identified in the EIR. (Guidelines, § 15091, subd. (c).) And the findings must be supported by substantial evidence in the record. (§ 21081.5; Guidelines, § 15091, subd. (b).)

---

[3] The CEQA Guidelines are set forth in title 14, section 15000 et seq. of the California Code of Regulations. All further citations will be referred to as Guidelines.

Section 15000 of the Guidelines states: "The regulations contained in this chapter are prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA].... [¶] ... [¶] These Guidelines are binding on all public agencies in California." The California Supreme Court has stated on several occasions that " 'at a minimum, ... courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' " (*Laurel Heights II, supra*, 6 Cal.4th at p. 1123, fn. 4; *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

The California Supreme Court explained the rationale for requiring that the decisionmaking agency make specific findings about alternatives and mitigation measures before approving a project for which significant environmental impacts have been identified:

"The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.] Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

■ The agency's decisionmaking body must adopt the required findings itself. It may not delegate the duty to make findings to agency staff or a subordinate body. (Guidelines, § 15025, subd. (b)(2); *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 526–529 [100 Cal.Rptr.2d 889].)

We note at the outset that it is nearly impossible to locate the pertinent documents in the 14-volume administrative record in this case. The majority of the relevant documents are neither properly indexed nor coherently organized. In fact, it is even unclear whether we have complete copies of the pertinent documents. The master index to the administrative record identifies only broad categories. For example, "[s]taff reports and notices" spans over 880 pages in three volumes, and "[s]tudies, reports and other technical documents" covers 1,137 pages in three volumes. Two volumes contain unidentified "[t]ranscripts" that contain no index of any kind.

POW elected to prepare the administrative record in this case. (See § 21167.6, subd. (b)(2).) Therefore, the fault in the poor organization and indexing of the record plainly falls on POW. But poor organization and a deficient master index alone do not necessarily make for an inadequate record. The problems with the record here arise not simply from disorganized, inadequately indexed documents. The problems are more fundamental. The documents generated by the County are inadequate for review. It is impossible to identify many of the documents as the County has failed to properly label them, and some documents appear incomplete. In addition, in the confusion of this record, it is often difficult to differentiate between documents and attachments to those documents. We find it inconceivable that, given the scope and magnitude of this project, the documents comprising the administrative record are so defectively drafted. This responsibility fell

squarely on the County. (See § 21081, subd. (a)(3); Guidelines, § 15091; see also § 21167.6, subd. (b)(2) [agency charged with certifying accuracy of record of administrative proceedings prepared by petitioner].) And we hold the County to it. Were we not to do so, we would be defeating one of the basic purposes of CEQA—to disclose to the public the reasons for a project's approval if the project has significant environmental effects. (See Guidelines, § 15002, subd. (a)(4).)

The importance of an adequate and complete administrative record is highlighted by the fact that project applicants often assist in the preparation of the record to ensure it is properly organized, indexed and presented in a form that is easy to follow. (2 Kostka & Zischke, *supra*, § 23.67, p. 987.) The project applicants are the parties who have an indisputable interest in upholding agency action approving a project. The consequences of providing a record to the courts that does not evidence the agency's compliance with CEQA is severe—reversal of project approval. (See *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 81 [118 Cal.Rptr. 34, 529 P.2d 66] [remand procedure not applicable in CEQA case where agency failed to make written determination of environmental impact before approving project as required by CEQA]; *Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1216, 1218–1222 [13 Cal.Rptr.2d 182] [trial court erred in remanding to agency to expand alternatives stated in EIR rather than granting writ vacating agency's certification of EIR].)

In this case, we reviewed the record for written findings pertaining to the lack of feasibility of the project alternatives and the reasons for rejecting those alternatives. The board of supervisors did appear to adopt "Related Environmental Findings prepared for Conditional Use Permit Application No. 99012 and Reclamation Plan," but it is impossible to determine from this record what those findings are. The findings mentioned in the excerpt of the minutes of the public hearing are not attached or otherwise referenced by the board of supervisors. In addition, the record contains different sets of "findings" related to the project made by the planning commission and its staff. In fact, POW notes that the record does not appear to contain a final resolution of approval of the project or certification of the EIR and acknowledges its own difficulty in locating the pertinent findings.

▮ Because we cannot discern the required findings under CEQA, we reverse the judgment. (See *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896–898 [236 Cal.Rptr. 794] [failure to comply with CEQA procedures necessarily prejudicial and not subject to harmless error analysis]; *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 443–445, 448–449 [243 Cal.Rptr. 727] [judgment reversed where city failed to make finding, in absence of mitigation

measures addressing significant environmental impact, that alternatives that would lessen environmental impact were infeasible]; § 21168.9.) As a result of our conclusion, we do not address POW's remaining contentions.

## DISPOSITION

The judgment is reversed. The trial court shall issue a peremptory writ of mandate directing the County to set aside its approval of the project. Each party shall be responsible for its own costs.

Dibiaso, Acting P.J., and Harris, J., concurred.

A petition for a rehearing was denied August 1, 2003, and the petitions of both respondent and real party in interest for review by the Supreme Court were denied October 15, 2003. Baxter, J., did not participate therein.