68 Cal.Rptr.3d 632 (2007)
157 Cal.App.4th 332
STOCKTON CITIZENS FOR SENSIBLE PLANNING et al., Plaintiffs and Respondents,
v.
CITY OF STOCKTON et al., Defendants and Respondents;
A.G. Spanos Construction, Inc. et al., Real Parties in Interest and Appellants.
No. C050885.
Court of Appeal of California, Third District.
November 28, 2007.
*633 Steefel, Levitt & Weiss, Judy V. Davidoff, San Francisco, Michael D. Early, and Beth C. Tenney; Sheppard, Mullin, Richter & Hampton, Arthur J. Friedman, San Francisco, for Real Party in Interest and Appellant Wal-Mart Stores, Inc.
Briscoe Ivester & Bazel, John Briscoe, Lawrence S. Bazel, San Francisco, and Christian L. Marsh, for Real Party in Interest and Appellant A.G. Spanos Construction, Inc.
William D. Kopper, Davis, for Plaintiffs and Respondents.
BLEASE, Acting P.J.
Real Parties in Interest A.G. Spanos Construction Co., Inc. (Spanos) and Wal-Mart Stores, Inc. (Wal-Mart) appeal from a judgment granting a peremptory writ of mandate that set aside the approvals for a 207,000 square foot Wal-Mart retail store to be constructed in the mixed use (M-X) zone of a Spanos commercial and residential development in the City of Stockton (City) called Spanos Park West (also known as The Business Park).[1] The approvals *634 were based on a letter to Spanos from the City's Community Development Department Director (Director) stating that "it has been determined" by an "[i]nitial staff review" that the plans for the store were "in substantial conformance" with a Master Development Plan adopted by the City.
The Master Development Plan (MDP) is based upon the provisions of the California Environmental Quality Act (CEQA) that apply to projects that will be carried out pursuant to a development agreement. (Pub. Resources Code, § 21157, subd. (a)(4).)[2] The MDP is an alternative to a project or program EIR. (§ 21157, subds. (a)(4) and (b)(2); Cal.Code Regs., tit. 14, § 15175, subd. (a), hereinafter CEQA Guidelines.) The anticipated projects are not subject to further environmental re; view if considered in a master Environmental Impact Report (EIR). (§ 21157, subd. (b)(2).)
The City approved the 560 acre Spanos Park West pursuant to the MDP and allied enactments that' condition the application of the MDP, including a Density Transfer Development Agreement (Density Agreement) that requires the construction of high density housing in the MX zone. The original project was to include business and residential development but was later changed to retail and residential development. The environmental review of the project was contained in a master EIR and a supplemental EIR. After the environmental review had been completed, Spanos informed the City it desired to build a Wal-Mart store on parcels of The Business Park designated solely for high density residential development by the Density Agreement and the MDP.
The plaintiffs challenge the validity of the Director's letter as an approval of the Wal-Mart project and the trial court agreed. Real parties argue that the plaintiffs may not do so because the period of limitations expired 35 days after the filing, on February 17, 2004, of a notice of determination that the project was exempt from CEQA. The complaint was filed July 22, 2004, more than 35 days after the filing of the notice of determination. In such a case section 21167 precludes review of a claim "that a public agency has improperly determined that a project" was exempt from CEQA. (§§ 21167, subd. (d), 21080, subd. (b)(1).)
Under CEQA Guidelines section. 15112, subdivision (c)(2), the 35 day period of limitations runs "[w]here the public agency filed a notice of exemption in compliance with Section 15062...." (Italics added.) Subdivision (a) of CEQA Guidelines section 15062 conditions the filing of the notice of exemption on the approval of the project by a public agency.
Thus, under section 21167 and the CEQA Guidelines the limitations period will not run if (1), the Director's letter did not constitute an "approval" of the Wal-Mart project, or (2), the Director was not authorized by a "public agency," the City, to approve the project.
The Director's action was contained in a letter to Spanos, labeled "status report," that said "it has been determined" by an "[i]nitial staff review" that the Wal-Mart plans were in substantial conformance with the MDP. The letter was not posted, published or otherwise made public, notwithstanding that the MDP authorizes an appeal by "[a]ny interested person" to the City Planning Commission of any decision *635 of the Director within 10 days of the decision. (MDP § 8.4.)
For these reasons we shall conclude that the Director's letter did not constitute an "approval" of the Wal-Mart project.
We also conclude that the Director's letter did not constitute a determination by a "public agency" since the Director was not delegated and could not have been delegated authority to approve a project requiring environmental review. (MDP § 8.2; Kleist v. City of Glendale (1976) 56 Cal.App.3d 770, 128 Cal.Rptr. 781.) The trial court found that "[t]he change from residential to a Superstore retail unit is a major change in the Development Plan that requires a discretionary act that triggers a CEQA review."
Real parties assume that plaintiffs may not challenge whether the Director "improperly determined" that he had authority to act for the City. They misread section 21167. The term "improperly determined" does not modify "public agency" and hence the limitations period of that section does not apply to the jurisdictional question whether the Director had authority to act for the City.
We shall affirm the judgment.

DISCUSSION

I

Introduction and Facts[3]
The real parties do not challenge the trial court's findings of fact and we include them as appropriate.

A. Overview of the Project
The trial court described the Spanos Park West project as follows:
"This lawsuit involves the development of Spanos Park West, which is located on the southwest corner of Eight Mile Road and Interstate 5 [in Stockton]. The Project involves the development of 560 acres with the original intent that the primary components would be business and residential. After a period of time, the primary components were changed to retail and residential due to the decline of business activity at that time. The Initial Environmental Document Transmittal form called for 2,514 residential units on 361.5 acres. It also provided for 1,700,000 sq. ft. of office space on 92.12 acres. The Spanos Park West [MDP] also contemplates two primary land use policies: 1) commercial/office policy, and 2) high density residential development policy. The same [MDP] also states that residential uses represents approximately 25 per cent of the proposed land use in the Plan area with four separate parcels for potential residential development. These four parcels are identified ... as Parcel[s] 17, 17A, 18 and 19." The Wal-Mart store is to be located on parcels 17 and 17A.

B. The Spanos Park West Planning Approvals
On December 20, 2001, Spanos requested that the City Council amend the City General Plan and zoning regulations and adopt a development agreement that would transfer Spanos'"obligation to construct ... High-Density Residential (minimum of 935 multi-family residential units) from the existing High Density Residential sites within the Residential Component to [a] proposed Mixed Use (MX) portion of the Spanos West Project."
The request was approved by the City Council on January 29, 2002, by the adoption *636 of an integrated set of enactments in compliance with the City Planning Code.[4] They conditioned the application of the MDP because the transfer of the multifamily units to the mixed use zone required an amendment to the City's General Plan, amendments to the City zoning ordinances, and a Density Agreement, which mandates that Spanos construct 935 multi-family residential units within the M-X zone in order to comply with the policy of the General Plan.[5]
For this reason the MDP states that it provides a "comprehensive description of all land uses proposed for The Business Park consistent with the objectives, policies, general land uses, and programs of the City's General Plan."[6] The MDP also provides: "All development within the Plan area ... is meant to be developed according to the primary use identified by A.G. Spanos Business Park Conceptual Site Plan, Figure 3-1, and Table 3-1, Land Use Summary." (Italics added.)
Table 3-1 lists Multi-family as the Primary Land Use for parcels 17, 17a, 18 and 19. In the text following the table, the MDP provides that "[t]he residential development program for A.G. Spanos Business Park consists of multifamily units. Four parcels (43.56 gross acres) within the Plan Area are proposed for multifamily [high density] residential development. The residential density would be 20 + units per gross acre."
The trial court concluded: "Table 3-1 [AR XXXXXX-XX] only designates Parcel[s] 17, 17A, 18 and 19 for residential use. Of these lots only Parcel 18 has been used for residential use. Lot 19 was used for office space and of course Parcels 17 and 17A are used for this Superstore."[7] For this reason alone the writ [of mandate] should issue."
Lastly, the Density Agreement notes that the "City of Stockton's General Plan ... provides that City shall maintain an adequate supply of land designated as high-density residential to meet the requirements of General Plan's Housing Element." For that reason it states that Spanos "has agreed to provide for and construct a minimum of Nine Hundred Thirty Five (935) multi-family units within the Mixed Use component of the Project." The Density Agreement recites that City "Code section 16-204.C requires that a development agreement be completed to implement the [MDP]...." (Recitals G.) And it recites Spanos'"commitment to *637 construct a minimum of [935] multi-family units as part of the development of The Business Park" and that "[i]n exchange for the[ ] benefits to the public ... of the multi-family residential development within The Business Park, [Spanos] desires to receive assurance that City shall grant permits and approvals for the development of the Project. In order to effectuate these purposes, the parties desire to enter in this Agreement."[8]
For these reasons the trial court found that the Wal-Mart store was to be placed on lots 17 and 17A and that "[b]y approving this retail complex on Lot[s] 17 and 17A it not only exceeds the retail limit [of the MDP][9] but it also prevents the construction of residential units." That led the court to find that "[t]he change from residential to a Superstore retail unit is a major change in the Development Plan that requires a discretionary act which triggers a CEQA review." [10]

C. The Environmental Review
As noted, the MDP is based upon the provisions of CEQA that apply to projects that will be carried out pursuant to a development agreement. (§ 21157, subd. (a)(4).)
To meet the requirements of CEQA, "[a] master environmental impact report may be prepared for ... [¶] (4) [a] project that which will be carried out or approved pursuant to a development agreement." (§ 21157, subd. (a)(4).)[11] The report must "describe] [the] anticipated subsequent *638 projects that would be within the scope of the master environmental impact report," including "[t]he maximum and minimum intensity of any anticipated subsequent project, such as the number of residences in a residential development" and "[t]he anticipated location and alternative locations for any development projects." (§ 21157, subd. (b)(2)(B) & (Q.) "It is the intent of the Legislature ... that a master environmental impact report shall evaluate the cumulative impacts, growth inducing impacts, and irreversible significant effects on the environment of subsequent projects to the greatest extent feasible." (§ 21156.) Environmental review thereafter is limited to projects not considered by the master report.
The Spanos Park West Project involves the "redesign, development and operation of the previously approved A.G. Spanos Park (West) Project in northwest Stockton," that was reviewed in a prior EIR. Consequently, it is the subject of a Supplemental Environmental Impact Report/Initial Study (SEIR 3-87/IS 13-00) that "focus[es] on the proposed project revisions...."
The SEIR reviewed the environmental consequences of an integrated set of documents, the "proposed [MDP], Development Agreement, Density Transfer Development Agreement, and related planning and zoning amendments" that were jointly approved by the City Council on January 29, 2002.[12] Since the Wal-Mart project was not authorized by these documents, it was not subject to environmental review in the SEIR.[13]
The Notice of Preparation of the SEIR for the MDP recites that the "Development Agreement specifies the terms and conditions for the development of the M-X component and will ensure that applicant will develop the M-X component consistent with the [MDP]." The draft SEIR states that "[h]igh density residential uses will be provided on Parcels 17, 17a, 18 and 19. These high-density residential uses are intended to serve residents seeking the convenience of a highly concentrated urbanized setting that minimizes the reliance on personal vehicles and optimizes the relationship between home and the workplace."

D. The Director's Letter
On October 29, 2003, the Director received approval from the A.G. Spanos Business Park Design Review Board (MDP § 8.2) "of [Spanos'] site plan for *639 construction of a 207,160 sq. ft. two-phased retail development ... on approximately 22.38 acres within the Spanos Business Park...."[14]
The Director responded with a letter labeled "Status Report Regarding Site Plan, Landscape Plan, Elevation and Design Approvalretail store," dated December 15, 2003, that said, in effect, that an "[i]nitial staff review" has determined that the site plan and elevations "are in substantial conformance with the" MDP. The letter was addressed to Doucet & Associates, representing Spanos, and ccd to Spanos and various employees of Stockton. The letter was not posted, published or otherwise made public.
The Director was informed by letter from Spanos, dated the next day, December 16, 2003, and headed "Amendment to Density Transfer Development Agreement,"[15] that Spanos "presently lacks the space within the M-X component of Spanos Park West necessary to accommodate the ... Six Hundred Twenty Seven (627) Units." The letter from Spanos to the Director was signed as approved by the Director on December 17, 2003. (See fn. 16, infra.)
Apparently, it was unclear to Spanos whether the December 15, 2003, letter from the Director to Spanos constituted an approval of the Wal-Mart project. Spanos sent a reply to the December 15 letter, dated February 5, 2004, from Spanos' lawyers, to the Director, stating Spanos'"understanding that [the] letter of December 15, 2003 constituted your approval of the Site Plan" and seeking "to confirm that your December 15, 2003 letter was the `decision' required by Section 8.2[and] that as a result the 10 day period for filing an appeal of that decision has expired."[16] (Italics added.)
Thus, the public was not informed of the Director's decision on December 15, 2003,[17] the form of the letter was such as to induce Spanos to seek a confirmation that it constituted an approval, and the only formal notice of the decision was the filing with the County Clerk two months later, on February 17, 2004, of a notice of determination, also signed by the Director, which recites that it is in compliance with section 21152, subdivision (b) of the Public Resources Code, and that the Director "has determined [inter alia] that the Site Plan ... applicable to the Project conform[s] to the standards set forth in the [MDP], which determination is a ministerial action not subject to CEQA review under [§ ]21080(b)(l) and CEQA Guidelines [§ ]15369."
We will consider the remaining facts when appropriate to the Discussion.

*640 II

The Director's Determination Did Not Constitute an Approval
The trial court ruled that the Director's "letter [is] not a formal order of approval" and for that reason "the [notice of determination], filed February 17, 2004 does not start the 35-day limitation to challenge the Government action."
Spanos argues that the trial court did not have authority to substitute its decision for that of the Director in determining that the letter did not constitute an approval. It cites to Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 571, 38 Cal.Rptr.2d 139, 888 P.2d 1268. However, Western States concerns a review of the record of a "quasilegislative" administrative decision.
The case is inapposite. The trial court did not review the facts determined in a quasi-legislative action of a public agency. Rather, it reviewed the legal question whether the form of the Director's purported decision, a letter denominated "status report" stating that "an initial staff review" had determined that the Wal-Mart project was in substantial conformance with the MDP, constituted a final determination of a public agency. The letter was sufficiently unclear to prompt Spanos to seek a "confirm[ation]" that the letter "was the `decision' required by Section 8.2...."
The formal requirements of an approval turn on the nature of that which is decided. CEQA Guidelines section 15352, subdivision (a) provides in relevant part: "The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances."
The rules and conditions of the MDP, section 8.4, provide that "[a]ny interested person" aggrieved by the decision of the Director approving a proposal for compliance with the MDP has 10 days to appeal to the planning commission.[18] Since the rule provides for appeals by members of the public, it contemplates that such an approval by the Director must be capable of being known by the public, either because the approval is posted or published or otherwise distributed to the public.
The letter of December 15, 2003, was not such an approval, because: (1) The letter was described as a "Status Report," thereby failing to inform the public that it was a final project approval, as the trial court found, and (2), so far as the administrative record shows, the letter was not posted, published, or otherwise made public at the time, so members of the public would not know to exercise their appeal rights. Moreover, the letter, although it did state that the status report concerned a retail store, did not state the size of the store or its location on specific parcels in the MX zone of Spanos Park West, or that it displaced 627 units of high-density housing required by the Density Agreement, or other information that would have put the public on notice of the nature and consequences of the project.
If the letter of December 15, 2003, was, in fact, made public at the time, it was the City's duty to include that fact in the administrative record. Section 21167.6, subdivision (e), provides in pertinent part: *641 "(e) The record of proceedings shall include, but is not limited to, all of the following items: [¶] ... [¶]; (2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project. [¶] ... [¶]; (5) All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project."
In keeping with this statute, it has been held that the duty to prepare an administrative record demonstrating compliance with CEQA falls "squarely" on the public entity. (Protect Our Water v. County of Merced (2003) 110 Cal.App.4th 362, 372-373, 1 Cal.Rptr.3d 726.) "The consequences of providing a record to the courts that does not evidence the agency's compliance with CEQA is severereversal of project approval. [Citations.]" (Id. at p. 373, 1 Cal.Rptr.3d 726.)
Here, the administrative record was prepared by the City of Stockton. (See § 21167.6, subds. (a) and (b).) It fails to show that the "approval" letter of December 15, 2003, was made public at the time so as to allow members of the public to appeal to the planning commission. At oral argument, counsel for real party Spanos conceded the letter of December 15 had not been made public. The administrative record therefore fails to demonstrate a timely valid project approval.
Since there was no valid approval of the project, there was no valid notice of exemption, and the 35-day statute of limitations set out in section 21167, subdivision (d), did not begin to run.[19](County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 963, 91 Cal.Rptr.2d 66.) Rather, the statute of limitations was "180 days from the date of the public agency's decision to carry out ... the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project." (§ 21167, subd. (d); see County of Amador, supra, 76 Cal.App.4th at p. 963, 91 Cal.Rptr.2d 66.)
In this case, "the date of the public agency's decision to carry out ... the project" and the "commencement of the project" occurred at the earliest on June 22, 2004, if then, when the City granted Wal-Mart a use permit to sell alcoholic beverages in the new store. (See Miller v. City of Hermosa Beach (1993) 13 Cal.App.4th 1118, 1143, 17 Cal.Rptr.2d 408 [issuance of building permit].) Plaintiffs filed their petition on July 22, 2004; well within the 180-day period.

III

The Period of Limitations is Dependent Upon Approval of a Project by a Public Agency
Section 21167, subdivision (d), provides that "[a]n action or proceeding alleging *642 that a public agency has improperly determined that a project is not subject to [CEQA] pursuant to subdivision (b) of Section 21080 [subdivision (b)(1) is applicable to ministerial projects] ... shall be commenced within 35 days from the date of the filing by the public agency ... of the notice of determination authorized by ... subdivision (b) of Section 21152." (Italics added.)[20] A failure to meet this deadline precludes review of a claim "that a public agency has improperly determined that a project" is exempt from CEQA. (See §§ 21167, subd. (d), 21080, subd. (b)(1); italics added.)
Section 21167, subdivision (d), is amplified by the CEQA Guidelines. Under CEQA Guidelines section 15112, subdivision (c)(2), the 35 day period of limitations runs "[w]here the public agency filed a notice of exemption in compliance with Section 15062...." (Italics added.) Section 15062, subdivision (a), applies only "[w]hen a public agency decides that a project is exempt from CEQA ... and the public agency approves or determines to carry out the project...." (Italics added.) An approval is therefore a necessary requirement for the commencement of the limitations period pursuant to section 21167.
Wal-Mart argues that "Public Resources Code section 21167, [subdivision] (d) requires that an objector challenge a determination that a project is exempt from CEQA within 35 days of the agency's filing of a notice of exemption. The filing and posting of a notice of determination or exemption constitutes constructive notice to all potential challengers, and no further notice is needed to trigger the limitations period." The notice of determination was filed on February 17, 2004. The complaint was filed July 22, 2004.
Alternatively, Wal-Mart argues that plaintiffs' claims are barred by the 180-day "catchall" deadline measured from the date of the approval by the Director, December 15, 2003. (§ 21167, subd. (a); CEQA Guidelines § 15062, subd. (d).) CEQA Guidelines section 15112, subdivision (c)(5)(A), provides that the period of limitations runs from the date of the "public agency's decision to carry out or approve the project...." (Italics added.) The complaint, filed on July 22, 2004, did not meet this deadline.
Thus, in either case advanced by the real parties, "approval" by a public agency is a predicate to the commencement of the statute of limitations. (See County of Amador v. El Dorado County Water Agency, supra, 76 Cal.App.4th at p. 963, 91 Cal.Rptr.2d 66.)
Accordingly, we next address whether the Director's determination constituted an action by a public entity, the City.

*643 IV

The Director Was Not Delegated Authority to Approve the Wal-Mart Project
As noted, the statute of limitations under CEQA Guidelines section 15112, subdivision (c)(2) does not begin to run from the filing of the notice of exemption of the Wal-Mart project unless the City, a public agency, has approved the project and that turns on whether the Director was delegated or could have been delegated the authority by the City to make the determination.
CEQA places limitations on the authority of a public agency to delegate its responsibilities regarding the review of the environmental consequences of a project. (Kleist, supra, 56 Cal.App.3d 770, 128 Cal. Rptr. 781.) The court said: "The state guidelines require that the decision-making body or administrative official having final approval authority over a project involving a substantial effect upon the environment review and consider an EIR before taking action to approve or disapprove the project. ([CEQA] Guidelines, § 15085, subd. (g).) The requirement exists in part because `only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials (Id, at p. 778, 128 Cal.Rptr. 781; see also Vedanta Society of So. California v. California Quartet, Ltd. (2000) 84 Cal.App.4th 517, 525, 100 Cal.Rptr.2d 889; Planning and Conservation League v. Department of Water Resources (2000) 83 Cal.App.4th 892, 907, 100 Cal.Rptr.2d 173 ["Delegation is inconsistent with the purpose of the review and consideration function since it insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values."]).
Although the CEQA Guidelines say that a public agency may delegate its decision making authority to "any person ... within a public agency permitted by law to approve or disapprove the project at issue" (CEQA Guidelines, § 15356), that does not extend to a decision to approve a project with environmental consequences. A footnote to CEQA Guidelines section 15356 regarding the meaning of "permitted by law" refers to the Kleist decision.
The question whether the Director was "permitted by law" to approve the Wal-Mart store is critical to this case. If the Director was not delegated authority by the City to approve the Wal-Mart project his letter of "approval" did not constitute a "decision by a public agency," as required by section 21167 and CEQA Guidelines section 15352.
Section 8.3 of the MDP sets out the procedures by which a proposed project is deemed within the matters considered in the master EIR for the MDP. It authorizes the Director to approve a project which substantially conforms to the MDP, i.e., is within the uses permitted by the MDP, and thereby has been considered for its environmental consequences. By contrast, a project which is not within the uses permitted by the MDP has not been reviewed for environmental sufficiency.
Section 8.3 provides: "Amendments to the Land Uses and Development Standards contained within the [MDP] can be separated into two classes. (1) Minor Amendments, i.e., amendments that the [Director] finds are consistent with the intent and purpose of [the MDP][21] and (2) *644 Major Amendments, i.e., [include] a request for an alternative project or use that the [Director] finds is not presently included as an alternative project or use within the [MDP] and is a project or use which is inconsistent with and does not share the same or similar characteristics of an allowed use identified within the [MDP]."
Although the MDP authorizes the Director to "find[ ]" that a project conforms to the MDP, it does not authorize the Director to approve a project which is not within the MDP or has environmental consequences. That is, it does not grant authority to the Director to determine his own jurisdiction and hence does not authorize the Director to mistakenly find that the project is within the MDP.[22]
Thus, section 8.3 of the MDP provides that "[m]ajor site specific changes, such as a request for a project or use which is not consistent with and does not share the same or similar characteristics of an allowed use identified within the [MDP] may be approved, provided: (1) the Design Review Board for A.G. Spanos Business Park recommends to the City of Stockton that the City issue a Conditional Use Permit for the project or use; and (2) that the City of Stockton City Planning Commission approves the proposed project or use and issue a Conditional Use Permit." If the Planning Commission determination is appealed to the City Council its decision is subject to the conditions, inter alia, "[t]hat the proposed project is in conformance with the City's General Plan; [and] [t]hat the proposed project of use would not adversely impact the environment...."[23]
For these reasons the MDP, read in the light of Kleist and its progeny, marks the line of review authority between projects that previously have been reviewed for their environmental consequences, which the Director may approve, and projects that have not, which he may not approve.

CONCLUSION And DISPOSITION
For the reasons set forth above, the Director's non-public determination that the Wal-Mart project was in substantial conformance with the MDP violated the multi-family residential requirements of MDP, as mandated by the General Plan and Density Transfer Development Agreement, violated the limited review authority delegated the Director by the City, and violated the provisions of CEQA that preclude the delegation of a public agency's authority to review a project that may have environmental consequences.
Accordingly, the Director's determination did not constitute an approval by a public agency as required by Public Resources Code section 21167, subdivision (a), and CEQA Guidelines. For that reason neither the determination nor the notice of determination were valid and the period of limitations for challenging the determination did not commence.
*645 The decision of the trial court granting a peremptory writ of mandate barring all approvals of the development of the Wal-Mart superstore is affirmed. The plaintiffs are granted their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)
SIMS, J., concurs.
NICHOLSON, J., Dissenting.
The majority opinion reached its conclusion that the 35-day statute of limitations did not run by wrongly voiding a CEQA "approval." It did this by (1) claiming the City did not give timely notice of its approval even though the City did in fact give notice; and (2) improperly ruling in favor of plaintiffs' claims on the merits. Neither ground is a legitimate basis for tolling the statute of limitations. I therefore dissent.

1. Approval and lack of notice

Relying on County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 91 Cal.Rptr.2d 66 (County of Amador), the majority opinion concludes a public agency's approval must not be defective procedurally in order for it to trigger the 35-day limitations period. County of Amador, however, did not so hold. There, the issue was not whether the statute of limitations ran because the approval was procedurally defective; it was whether the statute ran where there had been no approval at all. We concluded there was no approval in that case because the public agency's action did not, as required by CEQA, "`commit[ ] the agency to a definite course of action in regard to a project intended to be carried out by any person.' ([CEQA] Guidelines, § 15352, subd. (a).)" (County of Amador, supra, 76 Cal.App.4th at p. 964, 91 Cal. Rptr.2d 66.)
Here, there is no dispute that the Planning Director's letter of December 15, 2003, which was included in the administrative record, committed the City to a definite course of action. By approving the project, rightly or wrongly, as a ministerial project, the City bound itself to allowing the development to proceed. Except for the building permit, which is also ministerial, no other approvals were needed from the City before the project could be built. This was so even though the Director denoted his letter as a "Status Report." Thus, for purposes of CEQA, the letter was an approval.
Despite CEQA's clear definition of an approval, the majority opinion claims the Director's letter was not an approval because it was not made public at the time it was issued and thereby deprived the public of an opportunity to exercise its appeal rights under the MDP. Contrary to the majority opinion's holding, nothing in CEQA or the City's own rules specifies that the failure to give public notice of a ministerial approval voids the approval.
Assuming the Director was required to give public notice of his ministerial approval, the failure to give notice excused plaintiffs only from having to exhaust their administrative remedies before bringing this action. CEQA requires no party to exhaust administrative remedies where "the public agency failed to give the notice required by law." (Pub. Resources Code, § 21177, subd. (e).) Thus, plaintiffs were under no requirement to appeal the Director's decision to the Planning Commission, as otherwise required by City ordinance, before bringing this action.
However, the failure to give notice did not excuse plaintiffs from complying with the statute of limitations once the City in fact gave notice of its approval by posting the notice of exemption on the project. (McQueen v. Board of Directors (1988) 202 Cal.App.3d 1136, 1150-1151, 249 Cal.Rptr. *646 439, disapproved on other grounds in Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 576, fn. 6, 38 Cal.Rptr.2d 139, 888 P.2d 1268 [posting of notice of exemption triggered 35-day statute of limitations even though plaintiff received inadequate notice of project and was excused from exhausting available administrative remedies].) The statute of limitations begins to run once the notice of exemption is posted following the agency's approval, regardless of whether plaintiffs had notice of the approval at the time it happened or had notice of administrative remedies accompanying that approval. (CEQA Guidelines, § 15112, subd. (c).)
Indeed, the Director not giving public notice here at the time of his approval is a red herring. The City's notice of exemption gave the plaintiffs notice of the approval and cured the Director's omission. Moreover, it extended to plaintiffs 35 days to challenge the approval in court from the date of the notice of exemption, instead of the 10 days allowed from the approval date to challenge the approval before the planning commission. Plaintiffs suffered no prejudice from not being notified of the Planning Director's letter prior to the posting of the notice of exemption.
In short, the majority opinion relies on an inapplicable case and the specious ground of notice to void an approval that meets the requirements of CEQA. The opinion's conclusion is contrary to CEQA.

2. Ruling on the merits

Besides improperly voiding the approval on the basis of notice, the majority opinion unacceptably rules on the merits of the case to overcome the bar imposed by the statute of limitations. It asserts the Director's decision was not an approval because he could not have been delegated authority, and in fact was not delegated authority, to approve a project such as this that is inconsistent with the MDP and required further environmental review. (Majority at pp. 634-35, 644.) This reasoning posits the very issue the complaint sought to resolve as the basis for determining whether the limitations period ran. The Director's purported abuse of authority is not a valid ground for nullifying the statute of limitations.
The majority opinion reaches its conclusion on this argument based on faulty premises. Contrary to the opinion's assertions, CEQA authorized the City to delegate limited authority to the Director, and the City in fact delegated that authority to the Director. First, CEQA authorizes the City to "assign specific functions to its staff," including the authority to determine "whether a project is exempt" and the "[f]iling of notices." (CEQA Guidelines, § 15025, subds. (a)(1), (6).)
Kleist v. City of Glendale (1976) 56 Cal. App.3d 770, 128 Cal.Rptr. 781, relied upon by the majority opinion, is not to the contrary. That case held the functions of considering an EIR or a negative declaration (prepared for projects not exempt from CEQA) and making findings in response to significant effects identified in a final EIR cannot be delegated. (Id. at pp. 775, 779, 128 Cal.Rptr. 781.) Nothing in Kleist prohibits a lead agency from delegating the authority the City delegated to the Director heredetermining a project is exempt from CEQA.
Second, the City in fact delegated to the Director the authority to determine the project was exempt from CEQA and was consistent with the MDP, and to approve the project. A City ordinance assigns to the Director the responsibility to determine whether a project is exempt from CEQA. (Stockton Mun. Code, § 16-410.050, subd. B.) Also, the City's zoning ordinances vest in the Director the authority to approve projects that are consistent with an adopted MDP. (Stockton Mun. Code, § 16-208, subd. F.) Indeed, the *647 adopted MDP requires the Director to approve a project that complies with the MDP. Thus, the Director had lawful authority to determine the Wal-Mart project was exempt from CEQA and to approve it as consistent with the MDP, and his decision was a decision of the public agency.
Alleging the Director exceeded his authority and reached a decision not supported by substantial evidence are grounds for voiding the approval if the legal action raising those grounds is filed on a timely basis. These allegations are not, however, grounds for tolling the statute of limitations. The statute applies to any decision the agency improperly made, not just to decisions properly made. The 35-day statute states it applies to an action "alleging a public agency has improperly determined that a project is not subject to [CEQA]," and that the statute commences to run upon the filing of a notice of exemption. (Pub. Resources Code, § 21167, subd. (d).) The majority opinion turns the statute of limitations on its head, arguing in effect the statute does not commence to run if the agency's decision violated CEQA. No California court has conditioned the running of a statute of limitations upon the validity of the complainant's allegations, as the majority opinion does here. Applying the statute of limitations as the majority opinion does obliterates the statute.
The majority opinion concedes the action was not brought within the 35-day limitations period. For the reasons expressed, I would conclude the Director's. December 15 letter was an approval for purposes of CEQA, and I would reverse the decision of the trial court due to plaintiffs' failure to file their action within the time allotted by the applicable statute of limitations.
NOTES
[1] The appeal of the City of Stockton and the Stockton City Council was dismissed with prejudice on the motion of the City.
[2] A reference to a section is to the Public Resources Code unless otherwise designated or implied from the context.
[3] In Part II of the Discussion we consider and reject real parties' argument that we are bound by the Director's determination of the ultimate fact that his action constituted an approval of the Wal-Mart project.
[4] City Planning and Zoning Code, section 16-204 B., provides that "[f]or projects that will be designated as Mixed Use ... applications for a General Plan and Zoning Map amendments shall be submitted concurrently with the application for a Master Development Plan."
[5] As relevant here, the following resolutions and ordinance jointly were adopted by the City Council on January 29, 2002. (1) "Resolution Approving the Master Development Plan Regarding the Mixed Use (MX) Component (A.G. Spanos Business Park) of the Spanos Park West Project." (Resolution No. 02-0054.) (2) "Resolution Approving the General Plan Amendment Regarding the Spanos Park West Project-Mixed Use (MX) Component, A.G. Spanos Business Park." (Resolution No. 02-0053.) (3) "Ordinance Approving the Density Transfer Development Agreement for the Spanos Park West Project." (Ordinance No. 007-02.) "Resolution Certifying The Final Environmental Impact Report ... for the Spanos Park West Project." (Resolution No. 02-0052.)
[6] To this end the General Plan Amendment, as noted by the trial court, recites that "[t]he proposed Development Agreement is consistent with and necessary for the consideration and approval of the related discretionary General Plan Amendment rezoning and [MDP] applications...."
[7] Parcels 17 and 17A provide, respectively for 350 and 250 Multi-family units.
[8] In recognition that the Wal-Mart store displaced residential housing mandated by the Density Agreement, on October 9, 2003, Spanos filed a Development Agreement Application to "[a]llow Spanos to further develop the Spanos Park West power center by transforming Spanos obligation to construct high density residential units within Spanos Park West to other locations within the City." (Italics added.)

On December 16, 2004, the day following the date of the Director's letter at issue in this case, Spanos sent a letter to the Director titled "Amendment to Density Transfer Develop Agreement" informing him that "Spanos presently lacks the space within the M-X component of Spanos Park West necessary to accommodate the ... Six Hundred Twenty Seven (627) [multi-family] Units." In it Spanos requested a delay in the construction of the 627 units mandated by the Density Agreement and the approval of the Director to construct the units within 10 years within the corporate limits of the City of Stockton. The letter reflects that the Director signed the letter as approved on December 17, 2003.
The approval of the amendment to the Density Agreement was not authorized by the MDP since it was not preceded by approval by the Design Review Board, as consistent with the MDP, and was not within the authority granted the Director by the MDP. (MDP §§ 8.1-8.3.)
[9] The retail square foot limit of the MDP for parcels 17 and 17A is shown on Table 3-1 as zero for parcel 17 and 50,000 for parcel 17A, well below the 207,000 square feet of the Wal-Mart proposal.
[10] CEQA requires an EIR "whenever substantial evidence supports a fair argument that a proposed project may have a significant effect on the environment.'" (Laurel Heights Improvement Assn. v. Regents of Univ. of California (1993) 6 Cal.4th 1112, 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502.)
[11] "The Master EIR procedure is alternative to preparing a project EIR, staged EIR, or program EIR for certain projects which will form the basis for later decision making. It is intended to streamline the later environmental review of projects or approval included within the project, plan or program analyzed in the Master EIR. Accordingly, a Master EIR shall, to the greatest extent feasible, evaluate the cumulative impacts, growth inducing impacts, and irreversible significant effects on the environment of the subsequent projects." (CEQA Guidelines, § 15175, subd. (a).) It includes "Projects that will be carried out or approved pursuant to a development agreement." (Id., subd. (a)(5).) The required contents of a Master EIR are specified in Guidelines section 15176.
[12] The Notice of Preparation of Supplemental EIR for Spanos Park West states that "the Supplemental [EIR] Study ... will focus on the proposed project revisions that will require various discretionary approvals including: General Plan Amendments, Rezonings, Specific Plan Amendment for Eight Mile Road, Master Development Plan, Development Agreement, new Tentative Subdivision Maps, Special Use Permits, and/or Site Plan Reviews, etc."

The notice further states that one of the goals for the M-X component of The Business Park is "high density residential apartment uses."
The SEIR reviewed the noise and traffic impacts of the proposed multi-family residential units.
[13] The record contains a memorandum to Spanos from Fehr & Peers, transportation consultants, dated July 8, 2003 (after the adoption of the MDP and allied agreements), that purports to "document [a] trip generation comparison between the currently proposed Spanos Park West development [including the Wal-Mart project] and the previously approved project." (Italics added.) However, it is not included in the documents reviewed by the A.G. Spanos Business Park Design Review Board, dated October 29, 2003, a predicate to a determination by the Director (MDP § 8.4) and is not within the Director's determination at issue in this case. Moreover, as to this document, the trial court found it failed to make the correct traffic generation comparison.
[14] The document recites that "[a] written finding of consistency and compatibility of the terms of the [MDP], Development Agreement and all applicable policies and regulations for the building permit process will follow with subsequent submissions." However, we have found nothing in the record that shows any subsequent submissions other than the plans for the structure and associated landscaping and parking configurations.
[15] As noted above, on October 9, 2003, Spanos filed an "Amendment to Development Agreement Application [to] [a]llow Spanos to further develop the Spanos Park West power center by transforming Spanos obligation to construct high density residential units with Spanos Park West to other locations within the City." (Italics added.) So far as the record shows, the application was not acted upon and is not part of the Director's determination.
[16] The copy of the letter in the file does not show an affirmance by the Director.
[17] In the light of the lack of notice to the public and the Spanos letter to the Director on December 16, 2003, we find it odd that Spanos argues that plaintiffs failed to exhaust the appeal rights provided by the MDP.
[18] Section 8.4 provides in relevant part: "Any interested person dissatisfied with any decision of the Community Development Director ... required by the Master Development Plan, may, within ten (10) days of such decision[], appeal such decision[] to the Planning Commission, by the filing, with the Community Development Director, of a written notice of appeal. Such notice of appeal shall [inter alia] (1) specify the decision ... being appealed [and] (2) the reasons for such appeal...."
[19] Section 21167, subdivision (d), provides: "(d) An action or proceeding alleging that a public agency has improperly determined that a project is not subject to this division pursuant to subdivision (b) of Section 21080 or Section 21172 shall be commenced within 35 days from the date of the filing by the public agency, or person specified in subdivision (b) or (c) of Section 21065, of the notice authorized by subdivision (b) of Section 21108 or subdivision (b) of Section 21152. If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project."
[20] A "Public agency" is defined in section 21063 as "any state agency, board, or commission, any county,' city and county, city, regional agency, public district, redevelopment agency, or other political subdivision." It is somewhat differently defined in CEQA Guidelines section 15379 as "any state agency, board, or commission and any local or regional agency, as defined in the guidelines." Section 21063 is cited as authority for this definition.

"Local agency" is defined in the Guidelines as including "but is not limited to cities ... and any board, commission/or organizational subdivision of a local agency when so designated by order or resolution of the governing legislative body of the local agency." (§ 15368.)
The authority for CEQA Guidelines section 15368 is Public Resources Code section 21062. It provides that "`Local agency' means any public agency other than a state agency, board or commission. For purposes of this division a redevelopment agency and a local agency formation commission are local agencies, and neither is a state agency, board or commission."
[21] Minor Amendments are not subject to public hearings. They include "[c]hanges in development intensity or residential density that do not exceed the intensity or density established by the [MDP] and considered by the [MDP] EIR, such as lot line adjustments, a compatible land use change as provided in Section Three or adjustments to the local street system, are examples of minor adjustments that shall not require an extensive amendment process and shall be subject to the approval of the [Director] based on an approval recommendation of the Design Review Board."
[22] As noted above, the MDP, as it provides, must be read in the light of the enactments adopted by the City Council jointly with the MDP and which condition its application, such as the Density Agreement, which requires the construction of multi-family units within the MX zone of Spanos Park West.
[23] The MDP does authorize the Planning Commission to review a proposed project for its environmental consequences but only if "all significant adverse impacts of the proposed project or use can and will be mitigated to less than significant." (MDP, § 8.3.)