Filed 2/4/21  P. v. Vallejo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059005 |
| v. | (Super. Ct. No. 19WF1694) |
| OSVALDO VALLEJO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John D. Conley, Judge.  Affirmed in part, reversed in part.

James M. Kehoe, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Osvaldo Vallejo of two counts of robbery, and single counts of aggravated assault, criminal threats, and brandishing a weapon. It also found defendant personally used a dangerous and deadly weapon in the commission of the robberies. Defendant separately admitted allegations he had suffered a prior strike and a prior serious felony conviction.

The trial court imposed a four-year sentence: three years on the first robbery count, plus a consecutive one-year term for the weapon use enhancement. A similar concurrent four-year sentence was imposed for the second robbery, and sentencing on the remaining counts was stayed pursuant to Penal Code section 654 (undesignated statutory references are to the Penal Code). The court struck both prior conviction allegations.

On appeal, defendant raises four claims: (1) insufficient evidence supports the criminal threats conviction; (2) the trial court prejudicially erred by failing to instruct the jury on the lesser included offense of attempted criminal threats; (3) the trial court prejudicially erred by failing to instruct on a claim-of-right defense to the robberies; and (4) the judgment should be conditionally reversed, and remanded for a determination of defendant's eligibility for mental health diversion pursuant to section 1001.36.

We find defendant's first claim has merit, and the criminal threats conviction must be reversed; as a result, his second claim is moot. We reject his claim-of-right instructional error contention and find his mental health diversion claim has been forfeited. The judgment is therefore affirmed in part and reversed in part.

## FACTS

Because defendant raises a sufficiency of evidence claim as to his criminal threats' conviction, we lay out the facts surrounding that offense in some detail, but do so in the light most favorable to the jury's verdicts. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the other issues defendant raises on appeal are found in the discussion below.

2

One morning, C.L.'s small dog escaped and ran away. The dog had no collar, tags, or any identifying information on it. C.L. was alone with her infant child at the time, so she was unable to immediately chase after the dog. About two hours later, she called her brother, J.T., and asked him to help her find her dog. J.T. drove around the neighborhood looking for the dog, while C. L. searched on foot.

Soon thereafter, J.T. found defendant, holding C.L.'s dog in his arms. He asked defendant to return the dog. When defendant refused, J.T. reached out and tried to take the dog, but defendant was holding the dog "very hard." Defendant told J.T. the dog was his, clutched it in his arms, and ran across the street. J.T. then noticed defendant coming back toward him, but now holding a knife in his hand.

Defendant held the dog in a "chokehold" with his left hand, and began jabbing the knife toward J.T. with his right hand. Defendant was about two and a half to three feet away. J.T. feared he would be stabbed.

J.T. backed up, and urged defendant to "calm down." Defendant continued to approach, telling J.T., "Move, move," and, "Go away." Defendant was also yelling profanities and other things at J.T. as he was jabbing the knife at him, but J.T. could not understand most of it because it was in English and he only speaks Spanish.

As J.T. continued to back away, defendant continued to pursue him with the knife, and began slashing the blade toward J.T.'s face and neck from about three to five feet away. Defendant then lunged forward and punched J.T. in the side of the head with the closed fist of the hand in which he held the knife; the blade, however, was turned away. The punch caused J.T. to feel dizzy. J.T. said he remained "scared" of defendant, and felt "threatened" because he still thought he was "going to be stabbed." He then watched as defendant walked away with his sister's dog.

As defendant was walking away from J.T., C.L. arrived. She began pleading with defendant to return her dog, and offered to give him money if he would just give her back her dog. Defendant "didn't pay attention" to her and started running away

3

with the dog. C.L. chased after him, again pleading with him to give her dog back. Defendant stopped, turned, and confronted C.L. with the knife. He pointed the knife at her chest, holding it about a foot and a half to two feet away from her body. C.L. was "scared," and started to back away. Defendant began to chase her, angrily slashing his knife toward her. He then stopped, turned, and took off running down the street. C.L. chased after defendant, again asking him to "just give me back my dog." Defendant repeatedly told her it was his dog. As she ran after him, defendant started "doing something bad" to the dog, causing the dog to "scream," and further upsetting C.L.

Defendant tossed the dog over the fence of a nearby residence, jumped over, picked up the dog, and started running again. C.L.—who was "crying," "upset," and "scared"—called the police.

Responding officers found defendant about a quarter of a mile away, crouched down and "cuddling" C.L.'s dog. As they took defendant into custody, he was "aggressive the whole time" and was "yelling profanities" at the officers. He resisted being taken out of the patrol car for an infield show up, and refused to lift up his head so that the witnesses could see his face. A search of defendant's front pocket revealed a closed pocketknife about six inches long with a blade length of three inches. Officers also found a dog leash, which was not C.L.'s.

In the defense case, a nearby resident said he watched defendant running by while carrying C.L.'s dog, but did not see any knife. On cross-examination, he admitted he had told police that he had seen defendant holding a knife. A defense investigator interviewed J.T. He said J.T. told him that after defendant had punched him in the head, he no longer thought defendant would stab him, because "he could have stabbed me in the head, but he chose not to."

4

**DISCUSSION**

*1. Evidence Supporting a Criminal Threats Conviction*

Defendant first contends there was insufficient evidence to support his criminal threats conviction. His claim is two-fold: first, there was insufficient evidence of a *verbal* threat, because J.T. testified it was the knife that caused his fear, not defendant's words; second, even if J.T. was verbally threatened, there was insufficient evidence his fear was sustained.

We agree with defendant's first argument, but also find a more fundamental flaw in the evidence. The conviction must be reversed because defendant's words did not intentionally instill fear in J.T. of a future or additional crime. Rather, they were intended to make J.T. "go away," and thereby put an end to the ongoing assault with a knife. This was not a "criminal threat" as that crime is currently defined in section 422.

*A. Standard of Review*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104.) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

However, "the statutory definition of the crime proscribed by section 422 is not subject to a simple check list approach to determining the sufficiency of the evidence. Rather, it is necessary first to determine the facts and then balance the facts against each other to determine whether, viewed in their totality, the circumstances are sufficient to meet the requirement that the communication 'convey to the person threatened, a gravity

5

of purpose and an immediate prospect of execution of the threat.' This presents a mixed question of fact and law. In considering the issue, we will defer to the trial court's resolution of the historical facts by viewing the evidence in a light most favorable to the judgment. In determining whether the facts thus established are minimally sufficient to meet the statutory standard, we must exercise our independent judgment. [Citations.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 862; cf. *In re George T.* (2004) 33 Cal.4th 620, 630-634 [section 422 punishes speech so constitutional concerns may be present].) In this case, we find they are not.

### B. Analysis

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully *threaten*[*ed*] *to commit a crime which will* result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that *the threat actually caused* the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*), italics added; see § 422, subd. (a).) Moreover, "a threat made through nonverbal conduct falls outside the scope of section 422 as currently written." (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1147 [section 422 not violated by the defendant communicating a threat by making a gang hand sign and manually simulating a pistol pointed upward].)

6

Here, the only verbalizations defendant made that J.T. could understand were, "Move, move," and "Go away." And, as noted, defendant's nonverbal conduct—thrusting and slashing with his knife—cannot itself constitute a threat under section 422. Even so, a verbal threat is assessed by considering "all the surrounding circumstances and not just the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) "[I]t is the circumstances under which the threat is made that give meaning to the actual words used." (*People v. Butler* (2000) 85 Cal.App.4th 745, 753; see also *People v. Bolin* (1998) 18 Cal.4th 297, 340.)[1]

"A violation of section 422 is not complete upon the issuance of a threat; it depends on the recipient of the threat suffering 'sustained fear' *as a result of the communication*." (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201, italics added.) In other words, there must be a causal connection between the threat, i.e., the *words* used, and the victim's resulting fear.

J.T. testified he was "scared" while defendant was jabbing at him with the knife. His subsequent testimony was focused on what exactly he meant by that.

"[Prosecutor]: Before the defendant hit you in your ear, did he say something to you? [¶] . . . [¶] . . . Did the defendant say something to you?

"[J.T.]: To go away.

"[Prosecutor]: Did he say anything else?

"[J.T.]: No. Just that, to go away.

"[Prosecutor]: Did he say he was going to stab you?

"[J.T.]: No.

---

[1] The Attorney General muddies the distinction between the words used and the accompanying nonverbal conduct when he claims, "When [defendant's] words are considered in conjunction with the surrounding circumstances . . . *his conduct qualified as a criminal threat*." (Italics added.) Not so. The surrounding circumstances, including defendant's nonverbal conduct, may help give *meaning* to the words used, but a defendant's *conduct* cannot "qualify" as a criminal threat.

"[Prosecutor]: He never said he was going to stab you?

"[J.T.]: No. Just to go away."

The prosecutor pressed J.T., and asked him if he had told the police that defendant had said he was going to stab him, but J.T. said defendant "was talking to me in English and I did not understand. He just said "Move, move." Even after the prosecutor pressed him further, J.T. still maintained he did not remember telling a police officer that defendant said anything other than "Move, move."[2]

The prosecutor rephrased her question, and asked J.T. whether defendant ever threatened him, but J.T. responded, "Just with a knife." She asked, "But with his words, did he ever say anything to you orally that was a threat?" And J.T. replied, "He said several words in English, but I did not understand." On cross-examination, J.T. reiterated the only threat defendant made was with his knife, and the only words J.T. understood were defendant telling him to "go away," and "move, move," Finally, on redirect, the prosecutor tried again with a loaded leading question, and asked J.T. whether "[w]hen the defendant was saying move, move, and to go away, did you feel threatened?" J.T. said, "Yes," because "I was afraid I was going to be stabbed." She then went further:

"[Prosecutor]: When the defendant was saying some things that you couldn't understand, and he was making those motions with the knife towards you, is that when you felt scared?"

"[J.T.]: Yes.

"[Prosecutor]: Did you feel scared before that?

"[J.T.]: Yes, yes.

"[Prosecutor]: Is that because the knife – the knife was being motioned towards you?

"[J.T.]: Yes."

---

[2] The prosecutor did not call a police officer to impeach J.T. on this point.

Thus, the prosecutor was only able to establish that defendant used "words," which J.T. did not understand or feel threatened by, and that it was the knife that caused him to be in fear, both before and after the words were used. On re-cross examination, J.T. again testified it was the knife that made him fearful and feel threatened, and not the words defendant used.

Furthermore, the only reasonable inference to be drawn from this testimony is that defendant's words were not intended to instill fear of future harm in J.T., or to threaten him as to what would happen if he did not "go away." Instead, they were to tell him that if he went away, defendant would *stop* his ongoing knife assault.[3] Defendant's words were more a statement of his *present* intent than a threat to do a future harm which was intended to place J.T. in sustained fear.

Put another way, J.T. was placed in fear by defendant's ongoing assault with a deadly weapon, not by any words threatening "to commit a crime which will result in death or great bodily injury to another person." (§ 422, subd. (a).) Such a crime was already occurring, not merely threatened, and it was that crime which caused J.T.'s fear, not a verbal threat of a future one. The gravamen of a section 422 violation is the intentional infliction of sustained fear on another person by means of a verbal threat of death or injury. Thus, the analysis must focus on the intended effect a defendant's words have on the victim regarding what *will* happen, not what is happening at the time the words are uttered and when the victim is already in fear.

This conclusion dovetails with defendant's contention that no criminal threat occurred in this case because J.T. said defendant "did not threaten him with words, 'just a knife.'" If J.T. did not feel threatened by defendant's words, and only felt threatened by the knife, those few English words defendant uttered that J.T. could

_____

[3] This may explain why the prosecutor was so desperate to get J.T. to say defendant threatened to stab him; something that had not yet occurred, and which would reasonably instill fear of a more serious future event should J.T. not "go away."

9

understand did not "actually cause[]" J.T. to be placed in sustained fear, and section 422 was therefore not violated. (*Toledo, supra*, 26 Cal.4th at p. 228.)

We review for substantial evidence. Under this standard, our power "'*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.]" (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681.) Even so, "substantial evidence does not mean any evidence, no matter how slight." (*People v. Baker* (2012) 204 Cal.App.4th 1234, 1247.) Rather, it is "evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) As regards the criminal threats charge in this case, such evidence is lacking, and defendant's conviction for that offense must therefore be reversed.

## 2. Attempted *Criminal Threats Jury Instruction*

Defendant next contends the trial court prejudicially erred by failing to instruct the jury on the lesser included offense of *attempted* criminal threats and, as a result, the criminal threats conviction must be reversed on this ground as well. However, because we have reversed the conviction on other grounds, we need not and do not determine whether the failure to give the lesser included instruction in this instance was either error or prejudicial; the issue is moot.

## 3. *Claim-of-Right Defense Jury Instruction*

Defendant next claims the trial court erred by refusing his request to instruct the jury on a claim-of-right defense to the robbery charges. We disagree.

### A. Background

During preinstruction discussions with counsel, the court explained why it was not going to give CALCRIM No. 1863, the standard jury instruction for a claim-of-right defense. Citing *People v. Tufunga* (1999) 21 Cal.4th 935 (*Tufunga*), the court

10

explained that a mere claim of ownership is not enough to open the door to a claim-of-right defense. Rather there must be a "'bona fide claim of ownership or title,'" or "'a good faith claim of right to title or ownership,'" or a "'good faith belief' that the property belongs to [defendant]." Finding there was no evidence aside from defendant's "mere claim" of ownership of the dog, the court refused to give a claim-of-right instruction.

### B. Analysis

"At common law, claim of right was recognized as a defense to the crime of larceny because it was deemed to negate the *animus furandi*—or felonious intent to steal—of that offense. [Citation.] Because robbery was viewed as simply an aggravated form of larceny, it was likewise subject to the same claim-of-right defense. [Citation.]" (*Tufunga, supra*, 21 Cal.4th at p. 945.) Thus, our "Legislature over 100 years ago codified in [section 211] the common law recognition that a claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title." (*Id.* at p. 950.) We emphasize: the term used is "regain" the property in question, not to wrongly misappropriate it and then forcibly "retain" it.

In general, "'[a] party is not entitled to an instruction on a theory for which there is no supporting evidence.' [Citation.] '[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a *subjective belief* he or she had a *lawful* claim on the property.' [Citations.]" (*Tufunga, supra*, 21 Cal.4th at. p. 944, italics added.) "Whether or not the evidence provides the necessary support for drawing that particular inference is a question of law. [Citation.] Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is *minimal and insubstantial*. Doubts as to the sufficiency of the evidence should be resolved in the

11

accused's favor. [Citations.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, f. omitted, italics added.)

Defendant argues that his "defense was that he believed the dog was his," and "[t]here was substantial evidence to support this defense." We disagree. Although defendant falsely *told* the victims the dog was his, there was *no* evidence to show this was his actual subjective belief, let alone substantial evidence.

In defense counsel's closing argument, she speculated that defendant "most likely," saw a loose dog, and picked it up. There was no evidence to support this "likelihood." She further stated that when defendant "found this dog, it was lost property or abandoned property," with no identifying information. In reality, the evidence unequivocally showed it was neither: C.L. did not "lose" her dog or "abandon" it. Instead, the evidence showed the dog got out and ran away; it was not "lost." Similarly, the evidence showed C.L. and her brother went looking for the dog as soon as C.L. could safely leave her home; the pet was not "abandoned."

Moreover, defendant did not testify, did not explain to police it was his newly "acquired" dog while he was struggling with them and hurling profanities, and no other evidence was introduced to establish defendant's subjective belief C.L.'s dog was his and he had a lawful claim to it.

Defense counsel also told the jury this "is not theft," and analogized it to "walking down the street" and finding a $20 bill "on the floor [*sic*]." Not so.

First, the analogy fails because this case involves a pet dog, something qualitatively different from a generic piece of functionally untraceable currency. Indeed, C.L.'s frantic efforts to get her dog back demonstrated the animal was much more than a random federal reserve note found lying on the ground.

Second, "[o]ne who finds lost property under circumstances which give him knowledge of or *means of inquiry as to the true owner*, and who appropriates such property to his own use . . . *without first making reasonable and just efforts to find the*

*owner and to restore the property to him, is guilty of theft*." (§ 485, italics added.) And, unlike other forms of theft, appropriation of lost property under section 485 is not a specific intent offense. (*People v. Zamani* (2010) 183 Cal.App.4th 854, 856.) Similarly, "[a] violation of . . . section 485 does not require *actual knowledge* of the identity of the true owner." (*Id.* at p. 866.)

Here, defendant made no efforts to identify and restore the dog to its owner; indeed, he used a weapon to forcibly resist such a return. Even assuming he subjectively believed he had a right to the dog—and there is no evidence to support this premise—he had no basis to believe he had a *lawful* claim to the dog; indeed, he acquired possession of the animal by means of theft.

More importantly, the claim-of-right defense is generally limited "to the perpetrator who merely seeks to effect what he believes in good faith to be the *recovery of specific items of his own personal property*." (*People v. Waidla* (2000) 22 Cal.4th 690, 734, fn. 12, italics added; see also CALCRIM No. 1863 ["If the defendant *obtained* property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery). [¶] The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) *openly took it.*" (Italics added)].) As discussed, defendant here did not act to *regain* possession of his property, he acted so as to *retain* the dog after he had misappropriated it to his own possession and then resisted returning it to the dog's lawful owner.

A trial court need not instruct on a claim-of-right defense if there is only minimal and insubstantial evidence to support it. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148.) That is the case here. Even "when taken as a whole and viewed most favorably toward defendant, the evidence supporting a claim-of-right defense in this case was 'minimal and insubstantial.' [Citations.] Inasmuch as the court should not have

13

instructed on the defense at all, defendant's claim[] of prejudicial error . . . [is] rejected."
(*People v. Barnett, supra*, 17 Cal.4th at pp. 1146-1147.)

*4. Mental Health Diversion* (§ *1001.36*)

Finally, defendant contends the judgment should be conditionally reversed and remanded to the trial court to determine his eligibility for mental health diversion under section 1001.36. We find the claim was forfeited by defendant's failure to request diversion in the trial court in the first instance.

*A. Background*

Defendant's offenses were committed in July 2019, and he was charged and arraigned that same month. He was convicted in February 2020, and sentenced in March.

A year before defendant's crimes were committed, effective June 27, 2018, the Legislature enacted section 1001.36, and authorized pretrial diversion for qualifying defendants with certain mental health disorders. Section 1001.36 defined "'pretrial diversion' [as] the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication . . . ." (§ 1001.36, subd. (c).)

It authorized a court to grant pretrial mental health diversion if all the following criteria were satisfied: "[1] 'the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders'; . . . [2] the defendant's mental disorder was a significant factor in the commission of the charged offense, based on any relevant and credible evidence [citation]; [3] in the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment [citation]; [4] the defendant consents to diversion and agrees to comply with treatment [citation]; [5] and the defendant will not pose an 'unreasonable risk of danger to public safety,' as defined in . . . section 1170.18, if treated in the

14

community, based on the opinions of the district attorney, the defense, or a qualified mental health expert, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate [citation]." (*In re J.M.* (2019) 35 Cal.App.5th 999, 1005.) In addition to finding that a defendant meets these five threshold requirements, the trial court must make an additional sixth finding that the recommended inpatient or outpatient mental health treatment program will meet the defendant's specialized mental health treatment needs. (§ 1001.36, subd. (c)(1)(A).)

If found qualified, a defendant's criminal proceedings may be diverted for no longer than two years. (§ 1001.36, subd. (c)(1)(B)(3).) If he or she performs unsatisfactorily in diversion, including by committing additional crimes, the court may reinstate criminal proceedings. (§ 1001.36, subd. (d).) On the other hand, if the defendant performs satisfactorily in the diversion program, at the end of the diversion period the court shall dismiss the criminal charges. (§ 1001.36, subd. (e).)

From the time of his arraignment until the time of his sentencing, defendant did not request to be considered for mental health diversion. Moreover, the only thing in the record even remotely suggesting defendant may have possibly been a candidate for mental health diversion is a single sentence in trial counsel's sentencing brief, listing as a "Statutory Circumstance[] in Mitigation," the completely unsubstantiated claim that "[t]he defendant suffers from a mental condition that significantly reduced culpability for the crime; aka [*sic*] schizophrenia." This "condition" is never mentioned again and,

15

when offered an opportunity to make any additional comments at the sentencing hearing, trial counsel merely "submit[ted] on [her] sentencing brief."[4]

### B. Forfeiture

It is well established that the rule of forfeiture applies when a defendant has the opportunity to request a trial court to grant discretionary relief but does not raise the issue until appeal. (Cf. *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [forfeiture after failing to challenge a fee order]; *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 [forfeiture when the defendant failed to seek dismissal pursuant to section 1385]; *People v. Scott* (1994) 9 Cal.4th 331, 353 [forfeiture when the defendant fails to object to discretionary sentencing choices].)

Defendant cites *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), as support for a conditional reversal and remand remedy, but the case is inapposite. In *Frahs,* our Supreme Court addressed the narrow question of "whether [section 1001.36] applies retroactively to cases in which the judgment is not yet final," and held that it did. (*Id.* at

---

[4] In his opening brief, appellate counsel tells us that defendant's trial counsel "informed [him] telephonically that [defendant] has been diagnosed with schizophrenia." Once more, no further details or supporting facts are supplied, when and by whom this "diagnosis" was made, and no explanation is given for why nothing about defendant's purported mental condition was included in the probation and sentencing report. In any event, this telephone conversation is not part of the appellate record, and it is improper to refer to it in an opening brief on direct appeal. (See *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364 ["When practicing appellate law, there are at least three immutable rules: first, take great care to prepare a complete record; second, *if it is not in the record, it did not happen*; and third, when in doubt, refer back to rules one and two" (italics added)].) We therefore disregard it. Counsel also refers to the fact that a trial witness described defendant on the day of the offenses as not being "a normal person," and appearing as if he were "drugged." The probation report shows defendant's self-admitted long-term drug use and several drug arrests, so it is perhaps not surprising he appeared to the witness as being "drugged." More importantly, not being a "normal person," and appearing "drugged" are not "mental disorder[s] as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders." (§ 1001.36, subd. (b)(1)(A).)

p. 624.)  And as a result, the *Frahs* defendant's remedy was the limited conditional reversal and remand defendant seeks here.

However, *Frahs* involved a situation where it was "[a]fter defendant was convicted, and while his appeal was pending, [that] the mental health diversion statute came into effect." (*Frahs, supra*, 9 Cal.5th at p. 624.)  Here, in contrast, section 1001.36 had been in effect for over a year before defendant's arrest, let alone his sentencing hearing, and defendant made no request for mental health diversion.  Thus, defendant failed to avail himself of the mental health diversion program that was fully available to him from the outset, and only now asks us to allow him an opportunity to go back and get a do-over.  Like all statutory diversion opportunities, mental health diversion under section 1001.36 is an ameliorative scheme made available to those who wish to partake.  But to do so, a defendant must request it.  Failure to do so when the opportunity is available to a defendant forfeits that opportunity.

Defendant argues against by forfeiture by first pointing out we have "discretion to consider issues that have not been formally preserved for review."  While this is generally true, the cases he cites in support are inapt, and we are not inclined to exercise such discretion in the first instance in such an inherently fact-based inquiry as mental health diversion eligibility without any factual record from which to assess the claim.  (Compare *In re Sheena K.* (2007) 40 Cal.4th 875 [constitutional challenge to a probation condition]; see *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important *legal* issue" (italics added)].)  There is no legal issue to review in this instance because no legal issue was presented to the trial court and because diversion eligibility is a predominantly factual determination.  In fact, defendant is not requesting we *review* anything, only that we blithely reverse and remand a judgment to force the trial court to entertain the *possibility* of considering an issue that was never brought before it.  Defendant provides no authority for such an odd remedy, nor have we found any.

17

Defendant changes course, and contends the issue should not be deemed forfeited because his trial counsel was unconstitutionally ineffective for failing to request diversion. Again, we are not persuaded.

"An ineffective assistance claim has two components: A [defendant] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 (*Strickland*).) Both "are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

"There are countless ways to provide effective assistance [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland, supra*, 466 U.S. at p. 689.) And "to establish deficient performance, a [defendant] must *demonstrate* that counsel's representation 'fell below an objective standard of reasonableness,'" as measured by "'prevailing professional norms.'" (*Wiggins, supra*, 539 U.S. at p. 521, italics added; see *Bobby v. Van Hook* (2009) 558 U.S. 4, 7.) "When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did. [Citation.] . . . Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'" (*In re Gay, supra*, 8 Cal.5th at p. 1073; *Harrington v. Richter* (2011) 562 U.S. 86, 105 ["standard for judging counsel's representation is a most deferential one"]; *Bell v. Cone* (2002) 535 U.S. 685, 702.)

Defendant's "burden in this regard 'is difficult to carry' in this case, because this is a direct appeal and the record does not disclose the reason for counsel's [actions]. [Citation.] For those reasons, we may reverse '*only* if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there

18

simply could be no satisfactory explanation.'"""" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711, italics added.)[5]

Defendant summarily asserts there was no reason for trial counsel not to request diversion and that "it *seems likely* that [she] could have developed further the evidence needed to establish that defendant had a mental disorder that qualified him for the diversion program." (Italics added.) This is not accurate. A qualifying mental disorder is but one of many requirements for entry into the diversion program and, in any event, there is no competent evidence in the record that defendant suffers from a qualifying disorder.

Moreover, this argument overlooks the fact defendant refused to waive his right to sentencing within 20 days of his conviction, which effectively foreclosed counsel's ability to prepare and present the extensive evidence necessary for him to establish his eligibility for section 1001.36 diversion after the jury's verdicts.[6] Defendant cannot now claim his counsel's representation was flawed for following his own demands for a speedy sentencing. In essence, defendant *personally* forfeited his right to mental health diversion consideration, not his trial counsel.

In addition, there may well have been reasons why trial counsel chose not to request diversion. "Unlike a later reviewing court, the [trial] attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." (*Harrington v. Richter, supra*, 562 U.S. at p.

---

[5] "'All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *People v. Mayfield* (1993) 5 Cal.4th 142, 188 ["tactical choices presented to us on a silent record . . . are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them"].)

[6] At his sentencing hearing, when defendant was offered an opportunity to continue the hearing after learning the court's tentative sentence, he still insisted upon being sentenced then and there.

105.) Thus, trial counsel may have concluded defendant would never have been able to successfully meet his burden of proving his eligibility for such diversion. The probation and sentencing report in this case chronicles defendant's long history of recidivism, several failures at rehabilitation, failures to comply with postrelease community supervision, a series of arrests and convictions for resisting police officers, and committing crimes with a knife; these are not strong predictors of a successfully completed diversion program.[7] Similarly, nothing in the probation report mentions defendant ever having suffered from a mental disorder, let alone from the unsupported "schizophrenia" diagnosis trial counsel cryptically threw into her sentencing brief.

Furthermore, defendant had already served 494 days of his four-year term. Given his demands for a speedy sentencing, defendant may well have desired to leave the county jail and get on with his prison term, rather than continue to languish in the jail while an extended hearing regarding his eligibility for the diversion program dragged on. Defendant may also have refused to enter such a program because of the extreme terms and conditions with which he would be forced to comply and his own realization he would never be able to successfully complete diversion and earn a dismissal.

In any event, because we cannot determine on this appellate record why counsel did not request mental health diversion, the issue is better left to habeas corpus, where such questions may be pursued. For purposes of this direct appeal, the claim was forfeited by defendant's failure to raise it below.

---

[7] At the time of sentencing, defendant also had two pending misdemeanor cases. One alleged possession of a prohibited weapon and resisting arrest, and the other vandalism and resisting arrest. Both cases arose from incidents occurring in the two months before the offenses in the present case.

20

## DISPOSITION

The criminal threats conviction is reversed, and the stayed sentence imposed for that offense is vacated. The superior court clerk is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


FYBEL, ACTING P. J.


GOETHALS, J.

21