Filed 1/4/24  In re T.J. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re T.J., a Person Coming Under the Juvenile Court Law.

THE PEOPLE,

     Plaintiff and Respondent,

v.

T.J.,

     Defendant and Appellant.

E081349

(Super.Ct.No. J268952)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Charles J. Umeda, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Brendon Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

1

In January 2017, T.J., who was 17 years old, was alleged to come within the jurisdiction of the juvenile court (Welf. & Inst. Code, § 602, subd. (a)), due to murdering (Pen. Code, § 187, subd. (a))[1] Rocky Holmes (the victim) in January 2016. In 2017, the juvenile court transferred the case to the criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).) In 2023, the criminal court transferred the case back to the juvenile court, and the juvenile court again transferred it to the criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).) T.J. contends the juvenile court erred by returning the case to the criminal court. We affirm.

## FACTS

A.     <u>BACKGROUND</u>

T.J. was born in March 1999. T.J. is a member of the Alley Boys street gang. In 2011, when T.J. was 12 years old, he admitted a misdemeanor battery allegation (§ 242), which was settled outside of court.[2] At 14 years old, T.J. admitted an allegation of fighting (§ 415, subd. (1)), which was again settled out of court. Approximately three months later, the juvenile court sustained a first-degree residential burglary (§ 459) allegation against T.J., declared him a ward of the court, and granted him probation. Less than three months after that, the juvenile court sustained an allegation that T.J. acted as an accessory after the fact (§ 32) to a robbery. The juvenile court ordered T.J. to serve 50 days in juvenile hall. In June 2014, when T.J. was 15

---

[1] All subsequent citations will be to the Penal Code unless otherwise indicated.

[2] We infer that T.J. participated in an early intervention program, such as youth court, although it is unclear from the record. (Welf. & Inst. Code, §§ 601.5 & 654.)

years old, the juvenile court sustained an allegation that T.J. had possessed a firearm (§ 29610) and ordered him to serve 120 days in juvenile hall.

### B. MURDER ALLEGATION

The following has been alleged against T.J.: In January 2016, T.J., Michion Darby (Darby)[3], and possibly a third person formed a plan to rob the victim, who sold marijuana. T.J. or a coparticipant called the victim in order to schedule a meeting. When the victim arrived, T.J. asked, " 'Where's the weed at?' The victim responded, 'Where's the money at?' It was then [that T.J.] shot him." T.J. shot the victim's right temple, abdomen, and right hip. The victim died at the hospital.

### C. 2017 TRANSFER TO CRIMINAL COURT

In January 2017, the San Bernardino County District Attorney filed a petition against T.J. in juvenile court, alleging murder, robbery, and other offenses. In February 2017, the juvenile court, with the Honorable Pamela King presiding, ordered the case transferred to the criminal court. Applying the preponderance of the evidence standard, the juvenile court concluded, "The choices made by [T.J.] have consistently reflected his commitment to pursuing a life of crime, such that he is not amenable to the care, treatment and training programs of the juvenile system." The juvenile court dismissed the petition. T.J. was transferred to the county jail.

---

[3] *People v. Darby* (Sept. 7, 2018, D073858) [nonpub. opn.].

D.     REINSTATEMENT OF THE JUVENILE PETITION

Effective in 2023, the Legislature changed the law regarding transferring juvenile cases to criminal court. The change in the law requires juvenile courts to apply the clear and convincing evidence standard when determining whether a minor is amenable to rehabilitation in a juvenile facility. (Assem. Bill No. 2361 (2021-2022 Reg. Sess.), ch. 1012, § 1; Welf. & Inst. Code, § 707, subd. (a)(3).)

In January 2023, the criminal court concluded that jeopardy had not yet attached in T.J.'s case.[4] Therefore, the criminal court transferred T.J.'s case back to the juvenile court, and the juvenile petition from 2017 was reinstated so the clear and convincing standard of proof could be applied to the transfer determination. At that point, T.J. was 23 years old and had been housed in the county jail for six years.

The probation department wrote a report to the juvenile court concerning whether T.J. would be amenable to treatment in juvenile hall if his case were to remain in the juvenile court and the allegations against him were found true. The probation officer wrote, "Should [T.J.] be convicted of murder, he would only be under the Juvenile Court's jurisdiction until the age of 25, which is a little more than one year from now, as [T.J.] will turn 24 years old in six days." Further, the probation officer reported, "[T.J.] has been terrorizing the county jail staff and inmates over the past six

---

[4] A motion to transfer a case between juvenile and criminal court must occur before jeopardy has attached. (Welf. & Inst. Code, §§ 707, subd. (a)(1) & 707.01, subd. (a)(3)(A).) It is unclear what, if anything, happened in the criminal case between 2017 and 2023 because we have been provided with only the juvenile court record, not the criminal court record.

4

years. [T.J.] is fully indoctrinated and engaged in the life and politics of the adult county jail. He has been exposed to various types of adult criminals, participated in assaults, and initiated a riot." The probation officer recommended that the court follow the 2017 recommendation and again transfer the case to criminal court.

The juvenile court, with the Honorable Charles J. Umeda presiding, issued a written ruling transferring the case back to the criminal court. In the ruling, the juvenile court wrote, "In light of the seriousness of the charged offenses as committed the court determines that a commitment to a [secure youth treatment facility], Gateway to Arise[,] would be a possible option if [T.J.'s] case were to remain in the juvenile justice system. [T.J.] is currently twenty[-]four (24) years old. The Juvenile Court could retain jurisdiction over him until he is twenty-five (25) years old. The youth baseline term would be seven (7) years.

"Because of [T.J.'s] current age, the court believes that [T.J.'s] potential to grow and mature is limited. Furthermore, [T.J.]'s incarceration for approximately six years, acts of violence in county jail and lack of treatment while housed at county jail leads the court to conclude that he would require extensive rehabilitation over a long period of time for him to realistically be considered rehabilitated sufficiently for safe reentry into the community. At this time, if [T.J.] remains within the jurisdiction of the juvenile court, he would be committed to a secured youth treatment facility (SYTF) for less than a year before reaching his age of commitment. The court finds the evidence is clear and convincing that [T.J.] cannot be rehabilitated prior to the expiration of the juvenile court's jurisdiction."

## DISCUSSION

T.J. contends the juvenile court incorrectly believed it would have jurisdiction over T.J. only until he reached the age of 25 years.  The People concede the juvenile court erred, but assert the error was harmless.

T.J. and the People are correct that the juvenile court erred in calculating the expiration of its jurisdiction.  A juvenile court retains jurisdiction over a murderer until the murderer "attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility . . . whichever occurs later, . . ."  (Welf. & Inst. Code, § 607, subd. (c) [eff. through Sept. 12, 2023][5]; see also Welf. & Inst. Code, § 1769, subds. (b) & (d)(2).)  Thus, the juvenile court would have had jurisdiction over T.J. until two years after committing him to a juvenile facility, if the allegations were found true.[6]

We examine whether the juvenile court's error was harmless.  The People apply the standard found in *People v. Watson* (1956) 46 Cal.2d 818:  Whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Id.* at p. 36)  T.J. notes that the *Watson* standard does not require a finding that it is " 'more likely than not' " the result would have been different absent the error; rather, the standard requires " 'merely a reasonable chance,

---

[5] We use the version of the statute that was in effect at the time the juvenile court ruled and the parties briefed the issue in this court, as opposed to the version that became effective on September 13, 2023.

[6] The People contend that T.J. forfeited his contention by failing to raise it in the juvenile court.  T.J. asserts that if he forfeited the issue, then he received ineffective assistance of counsel.  We choose to address the merits of the issue.

more than an abstract possibility,' " that the result would have been different absent the error. (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329-330, italics omitted.)

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the [juvenile] court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).) One factor in making that determination is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (Welf. & Inst. Code, § 707, subd. (a)(3)(B)(i).) A juvenile committed to the Youth Authority for murder typically must complete seven years of rehabilitative programs before his first opportunity to be considered for parole. (Cal. Code Regs., tit. 9, § 30807, subd. (a)(1) & (a)(2).)

In its ruling, the juvenile court wrote, "The youth baseline term would be seven (7) years. [¶] Because of [T.J.'s] current age, the court believes that [T.J.'s] potential to grow and mature is limited. Furthermore, [T.J.]'s incarceration for approximately six years, acts of violence in county jail and lack of treatment while housed at county jail leads the court to conclude that he would require extensive rehabilitation over a long period of time for him to realistically be considered rehabilitated sufficiently for safe reentry into the community."

The juvenile court's ruling reflects that (1) the court was aware of the seven-year baseline, and (2) the court concluded that T.J. will require "extensive rehabilitation over a long period of time." By giving the seven-year baseline and then finding that T.J. will need "a long period of time" for rehabilitation, the juvenile court implied that

7

T.J. will need, at a minimum, seven years of confinement. There is nothing in the juvenile court's ruling indicating a belief that T.J. could be rehabilitated in less than seven years. Therefore, if the juvenile court were aware that it retained jurisdiction over T.J. for two years postcommitment, then the same result would have occurred because the juvenile court believed T.J. needed at least seven years of confinement. As a result, there is not a reasonable chance that, but for the error, the result would have been different.

In T.J.'s appellant's reply brief, he asserts that he has been made aware of programs in the County Jail and is currently working on his rehabilitation. We evaluate the case based on the record—not on factual updates presented in the briefs. (*Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364 ["if it is not in the record, it did not happen"].)

T.J. contends that he is now more mature than when he allegedly murdered the victim because he is almost 27 years old, so no longer a teenager. The juvenile court issued its ruling in May 2023, so T.J. was not a teenager at the time. Therefore, we are not persuaded that T.J.'s age could cause a different ruling if we were to reverse.

T.J. contends that there are a number of positive periods in his history, such as when he performed well in juvenile hall. Those positive periods were part of the record, in May 2023, when the juvenile court found that T.J. will "require extensive rehabilitation over a long period of time." Accordingly, the positive portions of T.J.'s history are unlikely to cause a different ruling if we were to reverse.

T.J. asserts that "the interests of justice demand a reversal" because he "has already been locked away for over seven years.  By the time this appeal has concluded, it will have been at least eight.  Assuming he were to be found culpable and served two more years in a juvenile placement, he will have served ten years.  From a societal standpoint, a decade is not an insignificant amount of time to serve, especially in consideration of the fact T.J. was a mere child at the time of the offenses."

We agree that T.J. has spent a significant amount of time in jail for a person who is awaiting trial.  However, it is unclear from the record why T.J. has spent so much time in jail while awaiting trial.  Due to that lack of information, one cannot determine whether justice requires a reversal.

At oral argument in this court, T.J. asserted the law pertaining to fitness hearings (§ 707) will change in January 2024—prior to the remittitur being issued—and therefore the case should be remanded for a hearing under the amended statute.  The 2024 amendment requires the juvenile court, at a transfer hearing, to "consider evidence offered that indicates that the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor."  (Sen. Bill No. 545 (2023-2024 Reg. Sess.) § 1 [future § 707, subd. (a)(E)(iii)].)

The probation officer's report provides: "About twenty minutes before the shooting [Witness No. 3] was driving and [T.J.] flagged her down for a ride to the store.  On the way, [T.J.] told her his intention to rob the weed man and his plan to come to her home to smoke it afterwards. . . .  Darby and [T.J.] phoned the weed man and when he arrived, [T.J.] demanded, 'Where's the weed at?'  The victim responded, 'Where's the

9

money at?'  It was then [T.J.] shot him."  After the shooting, T.J. went to Witness No. 3's apartment.  "[T.J.] said, 'It's all bad, I just shot a man.  He wouldn't give up the weed, so I killed him.' "

The record indicates that T.J. killed the victim because the victim demanded money from T.J. in exchange for the victim's marijuana.  There is nothing indicating that the victim trafficked or sexually abused T.J.  Accordingly, a different result is unlikely to occur under the 2024 amendments to section 707.

In sum, the juvenile court's error was harmless.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

MENETREZ
J.

10